**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO. 1:22CR00150-001** |
| | : | |
| **RAMANAN PATHMANATHAN,** | : | |
| **Defendant.** | : | |

**<u>UNITED STATES' SENTENCING MEMORANDUM</u>**

The defendant, Ramanan Pathmanathan, comes before this Court having pled guilty on January 30, 2026, to one count of Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a)(1), and one count of Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b). Consistent with the plea agreement in this case, the government recommends a sentence of 40 years' incarceration, followed by 10 years of supervised release. The defendant is scheduled to be sentenced on May 27, 2026.

### I. Background

- "i knew u were a fucking tease, that's why earlier i saved ur whole Instagram… ima legit gonna leak all ur nudes to everyone u fucking know bc i hate teases like u."

- "i like u more than her but when u lie like this i legit will leak ur nudes to ur followers list to everyone u know eventho i really dont wanna with u but ur forcing my hand"

- "idc listen, i saved ur Instagram list to my phone so even if u block me I can just send all the nudes u sent me to ur whole list so it gets passed around ur school… either u turn me on like u used to and stays between us or I leak ur nudes idgaf"

    - *Threats made by Ramanan Pathmanathan to children ages 6-17*
    -

The basic facts underlying this case are set forth in the Statement of Offense supporting the defendant's plea agreement (ECF no. 19) and in the Presentence Investigation Report (PSR)

1

(ECF no. 24). The facts that follow are provided to assist the Court in understanding the full scope of the defendant's conduct.

This investigation began when the mother of a minor victim (hereinafter "Minor Victim 1") contacted law enforcement about someone who was relentlessly stalking her minor daughter on social media and forcing her to engage in sexually explicit acts via live stream. Minor Victim 1's tormentor had communicated with her using Instagram and Facebook Messenger and presented himself as a teenage boy named "Brett" from New Jersey.  Law enforcement would eventually learn that the defendant had taken photos of a real teenage boy and used these to mask his identity while sexually exploiting Minor Victim 1 and many other children online.  Using the Brett persona, the defendant threatened to release sexually explicit photos and videos of Minor Victim 1 that he had secretly recorded if she did not continue to engage in the sexually explicit conduct that he demanded.

When Minor Victim 1's mother became aware of what the defendant was doing, she took over her daughter's Instagram account and communicated with the defendant directly. She explained that she was Minor Victim 1's mother and demanded that the defendant leave her daughter alone.  The defendant responded by demanding that the mother put her daughter back in touch with him and threatening to release the sexually explicit content he created of the child if the mother refused to comply with his demands. To show the mother he was serious about his threat, the defendant sent her a nude photo of Minor Victim 1 and a copy of her daughter's friends list.

Minor Victim 1's mother contacted the local police, who opened an investigation and served several search warrants on Instagram accounts used to contact Minor Victim 1. The Instagram returns revealed at least one true Internet protocol (IP) address that led to the

identification of the defendant and his residence in Canada. While reviewing the Instagram search warrant returns, the local police determined that the defendant was communicating with and sextorting so many minor victims, most of whom appeared to be located out of state, that they then sought assistance from the FBI. It was at this point that the investigation turned international.

On March 10, 2021, Canadian law enforcement executed a residential search warrant at the defendant's residence, where he lived with parents and brother. Canadian law enforcement seized several devices from the defendant, including the desktop computer that he used to sexual exploit more than 100 minor victims. The photos below depict the defendant's bedroom and the setup of his desktop computer when it was seized by law enforcement.

 

During an interview with Canadian law enforcement following the execution of the search warrant, the defendant declined to answer any questions regarding the minor victims or the child sexual abuse material found on his computer. The defendant denied having a sexual interest in children but admitted that he used the Tor network (commonly referred to as the "Darkweb") to access to violent and graphic content, including videos depicting beheadings. He also stated that

3

he liked watching "incest stuff with brothers and sisters." The defendant admitted using a Virtual Private Network (VPN)[1] but denied using Instagram or Facebook.

After law enforcement seized the defendant's digital devices, forensic examinations were performed. All relevant evidence was located on his desktop computer. Below are photos of the defendant's login screen (left) and desktop screen (right). As can be seen in the desktop screenshot, immediately upon logging into the defendant's computer, Express VPN booted up.

 

Below is a screenshot of the defendant's desktop with red circles placed around the folders ("2020," "Active," "NEW," and "WINS"). These are the folders where the defendant stored child sexual abuse material (CSAM) files associated with the minor victims that he sexually exploited in this case.

---

[1] A VPN is a security tool that creates an encrypted "tunnel" between a user's device and the Internet, masking the user's IP address and protecting the user's online privacy.



The folders mainly consisted of subfolders labeled with the names and ages of the minors that he sexually exploited. Inside most, but not all subfolders, are screenshots from the minors' social media account(s); screenshots of the minors' friends list; images and videos of the minors; and images and videos of the minors engaging in sexually explicit conduct. Most of the CSAM videos appeared to be screen recordings created by the defendant while the children engaged in sexual acts while on a live stream video chat (mainly Facebook Messenger, but some from Instagram, Skype and Zoom). The defendant can be seen typing on the left side of the screen sending nonstop messages to the minors. The defendant never showed his face during the chats. The minors can be observed on the right side of the recordings during the video chats.

The "WINS" folder (shown below) contained over 100 subfolders. Below is a screenshot depicting the structure of the WINS folder. Each folder lists the child's name and age. The folders labeled "dog" after the child's name depict children who were forced to engage in sexual acts with

dogs. The folders labeled "incest" after the child's name depict children forced to engage in sexual acts with siblings or relatives.[2]



The defendant's laptop computer contained multiple files in a subfolder titled "_d," which contained images depicting bondage and discipline, dominance and submission, and sadism and masochism (BDSM), and images and videos of men masturbating and exposing their genitals. The defendant sent these images and videos to minor victims to instruct the minors on how to perform the sexual acts that he wanted to see them perform.

The defendant had a Notepad document saved on his desktop with a list of all his social media accounts and some of the passwords with those accounts. These accounts matched some of the accounts reported by victims and the Instagram accounts obtained via search warrant. The defendant used multiple social media accounts to contact minor victims and was frequently compelled to create new accounts after the minor victims blocked or deleted his accounts or

---

[2] The names of the victims have been redacted to protect their privacy.

reported his accounts to social media companies for abuse. Rather than give up after his accounts were blocked or terminated, the defendant created new accounts and continued to harass the minor victims.

At the end of the document, the defendant listed the names of multiple minors with numbers saved after each minor's name. The numbers corresponded with each minor's answers to what the defendant referred to as the "freaky question game." Below is the image the defendant sent to many of the minors when asking them to play the freaky question game.



After sending this image to many of the minors, the defendant would ask them to answer certain questions from the list. This was one of the grooming tactics used by the defendant to sexually exploit his victims.

The screen recorded video chats of the victims show the defendant utilizing "BlueStacks" to access Instagram and other applications that he used to chat with victims. BlueStacks is an

Android emulator for Windows and Mac. Using BlueStacks, a user can run virtually any Android application on a desktop computer. Like any emulator, BlueStacks creates a virtual version of an Android device that runs in a window on a computer. Emulators make it easier for individuals, like the defendant, to access desktop computers platforms generally used on cell phones. Some of the screen recorded video chats created by the defendant show the defendant not only using BlueStacks to chat with victims on social media platforms, but at the same time, he can be seen in the screen recordings playing poker in the background.

The defendant had two different VPNs downloaded on his computer, Express VPN and Open VPN. The defendant downloaded and, on several occasions, ran system optimization and data destruction utilities to include CC Cleaner, Eraser, Advanced System Care, and Cleanmem. These programs are often used for privacy protection. These programs remove browsing history, temporary files, registry entries, and cookies, or securely wipe disks to make files unrecoverable.

The defendant's web browser history revealed he accessed Instagram and Facebook Messenger countless times. Records show he was sexually exploiting a minor victim within hours of being arrested. Forensics revealed the defendant was chatting on Facebook Messenger until 5:00 AM on March 10, 2021, the morning the residential search warrant was executed. The files in the subfolder "[VICTIM NAME] 13" within the "WINS" folder show that his last Facebook Messenger video chat recording of this victim was saved around the same time. Inside this victim's folder are eight (8) files that were created between 2:41 AM and 5:09 AM on March 10, 2021.

Ultimately, the investigation into the defendant led to the identification of approximately 145 minor children whom the defendant sexually exploited between March 2014 and March 10, 2021, the date of his arrest. All the minors reported the same type of conduct by the defendant. Generally, the defendant initiated contact with the minor victims by using the direct message (DM)

features on Instagram or other similar platforms. In the initial DM, the defendant asked what grade the victim was in and/or the age of the victim and where the victim was located. If the child responded, the defendant followed a pattern of complimenting the victim, requesting to see what the victim looked like, telling the victim she was "so natural," playing the freaky question game, and sharing content from relationship/BDSM profiles with the victim. The defendant would then instruct the minor victims to move their conversations to Facebook Messenger or other similar video chatting platforms. Despite initiating contact on Instagram, the defendant frequently told his minor victims that he could not use Instagram's video chat feature due to his phone capabilities.

On many occasions, the defendant directed victims to make secondary or spam accounts on various social media platforms, including TikTok, Instagram, Skype, Zoom and Facebook. The defendant then told the minors he wanted to be the only "follower" of the spam account. During some DM sessions, the defendant sent videos of an unidentified male removing his shirt and pants. At times, he sent photos and videos of a male masturbating. Often, he told the minor victims a that he had broken up with a girlfriend or was having relationship issues.

The defendant never showed his face or spoke into the microphone during the video chats. Instead, he typed messages to the victims in the chat feature. It was during these typed chats that the defendant forced the minors to engage in sexually explicit conduct including masturbating with foreign objects (hairbrushes, toothbrushes, bobby pins, etc.), sexual acts with animals, friends and relatives.

The defendant was very specific about his sexual demands. When the minors declined to engage in requested conduct, the defendant threatened them by stating that he would release sexual images and videos of the victims to their friends and family. Often, the defendant sent the minors

images and videos of themselves in the chat along with a photo of their friends list from social media sites to prove he that he could "leak" the photos/videos if they did not comply.

The defendant's desktop contained videos depicting victims crying, experiencing physical pain, begging to leave the video chat, and/or expressing thoughts of harming themselves. Despite the obvious pain and distress that he was causing his victims, the defendant did not relent. Below are examples of messages between the defendant and some of the minor victims.

*Threats sent to Minor Victim 1 from Defendant on Instagram*[3]



Below are messages between the defendant and the victim charged in Count 2 of the indictment who will hereinafter be referred to as Minor Victim 2. While the messages below were being exchanged, Minor Victim 2 was on a video chat with the defendant. Images of Minor Victim 2 have been redacted from the photos as she is engaged in sexually explicit conduct on the screen. The defendant forced the minor to insert two markers into her vagina. During the conversation,

---

[3] Minor Victim 1's name and user icon have been redacted for privacy.

the following messages were exchanged which depict the defendant's demanding and controlling behavior, the victim's pleas to stop engaging in the conduct, and the defendant's threatening responses.[4]

*Messages sent to Minor Victim 2 from Defendant on Facebook Messenger Video Chat*



_____

[4] Minor Victim 2's name and user icon have been redacted for privacy.



The youngest victim identified in this case was 6 years old at the time the defendant forced his babysitter, who was also a minor victim, to sexually exploit him. These are the minor victims charged in Count 5 to which the defendant has pled guilty. The defendant forced both victims to engage in several different sexual acts to include oral copulation. Below are examples of messages sent by the defendant to these minor victims.[5]

*Messages sent to the Minors Charged in Count 5 from Defendant*
*on Facebook Messenger Video Chat*

---

[5] The names of the minor victims have been redacted for privacy.



As previously noted, the defendant forced several minor victims to engage in sexual acts or attempt to engage in sexual acts with animals. The minor victim charged in Count 3 of the indictment was one of the victims who was forced into these awful acts. Below are messages sent by the defendant directing the minor victim to engage in sexual acts with a dog. As can be seen in the screenshots, the defendant even sent the minor victim a video depicting bestiality with a dog. In the screen recording, the minor victim can be seen shaking her head "no." In response, the defendant responded, "shut up dont shake ur head at me…u gonna have some kink as me in bedroom that only belongs to me."[6]

---

[6] The Minor Victim's name and user icon have been redacted for privacy.

13



The screenshots above provide only a limited illustration of the defendant's modus operandi and are offered to demonstrate how the defendant routinely acted in his interactions with the minor victims.

## II.    <u>Sentencing Analysis</u>

In all cases, to determine the appropriate sentence the Court must consult not just the Guidelines (which in this case are calculated at life), but also the factors set forth in 18 U.S.C. § 3553(a). Here, the parties entered a binding plea pursuant to Fed R. Crim. P. 11(c)(1)(C), that once formally accepted by the Court impacts the available sentence of incarceration. Specifically, the available sentencing range will be 180 to 480 months' imprisonment.

The 18 U.S.C. § 3553(a) Sentencing Factors Warrant a Sentence at the Top of the Guidelines

In this case, careful consideration of the factors set forth in 18 U.S.C. § 3553(a) confirm that a sentence at the high end of the sentencing range is an appropriate sentence. In determining a sentence, the Court must consider the following factors listed in 18 U.S.C. § 3553(a):[7]

---

[7] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738.

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
(3) the kinds of sentences available;
(4) the applicable sentencing guidelines range for the offense;
(5) pertinent policy statements issued by the U.S. Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019).  A district court, however, need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A.   The Nature and Circumstances of the Offense

The seriousness of the defendant's conduct cannot be overstated. The defendant's sexual exploitation of children involved more than 145 children, occurred over an extended period, and continued until the day that law enforcement entered his front door and arrested him. A few hours before his arrest, the defendant had just sexually exploited his last minor victim, a 13-year-old girl. Over the years, the defendant refined his manipulative tactics into a highly specific pattern that he repeatedly employed with each minor victim he targeted. The defendant groomed his victims,

---

Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. And *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

coerced them into engaging in sexually explicit conduct, and then used that conduct as a means of manipulation, control, and intimidation. He subjected the minor victims to relentless and deeply disturbing threats. The minor victims repeatedly begged the defendant to stop and to leave them alone. They blocked his accounts, reported him to online platforms, and attempted in every way they could to escape his abuse, yet the defendant persisted. He continued to stalk, harass, and threaten the victims to such an extent that several expressed thoughts of suicide because of his conduct. The defendant's cruel responses can be observed in the messages outlined in this memorandum.

This type of conduct is incredibly damaging and dangerous for the victims. Between October 2021 and March 2023, there were over 13,000 reports of sextortion made to the FBI. *See* Margaret Galles, *Combating the Rising Threat of Sextortion*, 46 Mitchell Hamline L.J. Pub. Pol'y & Prac. 134, 137 (2025). In at least twenty of those cases, the child victim took their own life, and other victims turned to self-harm. *Id*. The sad reality is that these numbers are likely underreported as many victims are too scared or embarrassed to report this type of exploitation. *Id*.

In June 2025, Thorn, a nonprofit that builds technology to defend children from sexual abuse and exploitation in the digital age, released new research exposing the serious emotional and at times physical impact sextortion is having on kids and teens in the United States. *Sexual Extortion & Young People: Navigating Threats in Digital Environments*, Thorn, (June 2025), https://info.thorn.org/hubfs/Research/Thorn_SexualExtortionandYoungPeople_June2025.pdf.

Drawing on responses from a survey of 1,200 people 13 to 20 years of age, the report examined the victims' experiences of being sextorted as minors. There were several key findings noted in the report. "A majority of the young people who had experienced sexual extortion described high-risk and harmful actions taken in response to the demands made. Around 1 in 6

indicated they sent more sexual imagery of themselves (18%) and/or did certain things in the content (17%), 1 in 7 indicated they had self-harmed (15%) and/or remained in or returned to a relationship (14%), and 1 in 10 indicated they sent more imagery of someone else (10%) and/or met the person threatening them for sexual activity offline (10%)." *Id* at 32.

The study also found that technology plays a crucial role in sextortion abuse. The study revealed that 81% of victims said the threats occurred exclusively online, often through social media or messaging platforms. *Id*. at 5 and 37. The victims were also asked about how they responded to sextortion. The study revealed that "[w]hile the vast majority (70%) indicated they took action online, mainly through the use of available online safety features like blocking tools (44%) and/or reporting features (24%), nearly half of victims (47%) indicated they sought support offline, most likely by telling their parents (23%). Around 1 in 7 victims (16%) indicated that they never disclosed their sexual extortion experience to anyone, either online or offline." *Id*. at 32.

The extent of the lasting harm caused by the defendant in this case may never be fully known. What is clear, however, is that the defendant's actions caused significant damage to the minor victims and to their families, warranting a substantial sentence. This harm is expressed in the victim impact statements submitted in this case. One victim described being terrified and living in a constant state of paranoia after receiving threats from the defendant. This victim also described how she continues to struggle with trusting men who try to have a romantic relationship with her and how the ordeal has caused disputes among her family.

Another victim described how she has struggled mentally and emotionally since the offense. She has a hard time trusting people and suffers from anxiety. She finds it difficult to receive affection from her husband. She kept the situation a secret for a long time which led her

to feel very alone. This situation has remained with the victim for years and it continues to affect her life. The mother of this victim also provided a statement which is very powerful and shows that the defendant's conduct was felt by so many more than just the 145 identified victims, but also the families of those children. The mother described the situation as a nightmare and the hardest thing she has ever dealt with. She detailed how she was so worried her daughter would kill herself or be abducted by the defendant that she slept outside her bedroom door. She would also go into her daughter's room at night to make sure she was still alive. The effect the defendant has had on the victims in this case and those who love them is devastating.

Not only did the defendant engage in the above-described conduct, but he also downloaded CSAM on his computer. Some of these downloaded files were from identified child pornography series. The forensic examination of the defendant's computer located over 1,500 images and videos of this type of content. These were saved in subfolders within the folder titled, "NFLpacks." Given the serious nature and circumstances of his offenses, a 40-year term of incarceration is both justified and necessary to protect one of societies' most vulnerable groups, children.

### B. History and Characteristics of the Defendant

The history and characteristics of the defendant make this case even more troubling. According to the PSR, the defendant's parents were consistently invested in his education and future opportunities. He appears to have been raised in a stable environment, was socially well-adjusted in school, maintained many friendships, and participated in sports and other activities.

After high school, the defendant attended a university near his parents' home alongside several friends from high school, allowing him to enter college with an established social circle and support system. Despite these opportunities, he ultimately dropped out of college and moved

back in with his parents, where he apparently devoted his time and energy to the systematic sexual exploitation of children online.

In October 2022, Dr. Philip Klassen performed a psychiatric assessment of the defendant. Dr. Klassen reported that although there were indications the defendant made efforts to manipulate the test outcome, he opined that the defendant suffered from one or more paraphilic disorders including "a combination of coercive sexual interest, and hebephilia." Dr. Klassen also pointed out that the age range of the victims; the defendant's references to incest/daddy; themes of power/control; and submissiveness including object insertion, nipple clamps, and tying/choking supported the conclusion that the defendant's behavior was driven by sexual interest and competitive urges.

Other statements made by the defendant to Dr. Klassen that are very concerning include the fact that he placed the photos and videos of the victims in folders based on the extent to which his extortion was successful and that he victimized individuals in a certain age group as he had more success "winning" with them. Taken together, the history and characteristics of the defendant show that he was afforded every opportunity to lead a productive and law-abiding life. Despite those advantages, he chose instead to sit behind a computer and sexually exploit countless vulnerable children over an extended period, with no indication that the behavior would have ceased absent intervention by law enforcement. It appears he did this to appease both his sexual desires and urges of control. The history and characteristics of the defendant support a lengthy prison sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

As described above, the defendant has sexually exploited at least 145 identified minor victims. Although at first glance a 40-year prison recommendation may appear substantial, when

viewed in the context of the number of minors harmed, it amounts to approximately 3.3 months of incarceration per child victim. Given the profound and lasting impact these offenses have had on so many individuals, such a sentence is not excessive. Rather, it reflects the extraordinary scope and seriousness of the defendant's conduct and it is necessary to reflect the seriousness of the conduct at issue, promote respect for the law, and provide just punishment.

### D. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

A substantial sentence is necessary to protect the public from further crimes of the defendant. As reflected in the PSR, the defendant has documented indicators of an above-average risk of reoffending, which heightens the concern that, absent a significant term of incarceration, he poses a continuing danger to the community. The government's recommended sentence appropriately accounts for this risk and the need for incapacitation.

The defendant's conduct reflects a pattern of sexual exploitation that caused serious harm to a large number of minor victims, resulting in significant mental, emotional, and in some instances, physical harm. The scale, duration, and nature of the conduct demonstrate not only the seriousness of the offenses but also the defendant's sustained willingness to prioritize personal gain over the well-being of others.

Notably, the defendant has not demonstrated any genuine remorse for his actions, further underscoring the risk of recidivism and the need for a sentence that will protect the public. In light of these factors, a lengthy term of imprisonment is required to reduce the likelihood of future victimization and to ensure that the defendant is not in a position to reoffend in the community.

### E. The Need for the Sentence Imposed to Afford Adequate Deterrence

Congress, the Supreme Court, and the Sentencing Commission have indicated that general deterrence is a very important factor when considering an appropriate sentence in child pornography cases. As the Sixth Circuit Court of Appeals explained:

> "[g]eneral deterrence is crucial in the child pornography context." 591 F.3d at 834. The court elaborated that "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *Id.* (quoting *United States v. Goldberg,* 491 F.3d 668, 672 (7th Cir. 2007)). Similarly, in *Bistline I*, this court rejected the district court's determination that general deterrence would have "little [if] anything to do" with the defendant's sentence. *Bistline I*, 665 F.3d at 767 (alteration in original). Our court has thus made clear that general deterrence in the child-pornography context is not a "myth." The district court's decision to give this factor little weight was therefore unreasonable.

*United States v. Demma*, 948 F.3d 722, 731–32 (6th Cir. 2020); *see also United States v. Goodin,* 815 Fed. Appx. 860 (6th Cir. 2020) (finding no abuse of discretion where the court considered general deterrence in fashioning a sentence for an offender convicted of sexual exploitation of children).

Deterrence is extremely important in this case as sextortion is a growing trend. Like the defendant, predators who sextort children online can reach and exploit a stagger number of children. The defendant appeared to treat his sexual exploitation of his victims as a game. Over time, the sexual demands that the defendant made upon his victims grew more extreme and he expressly characterized the CSAM videos that he obtained in the end as "wins." A sentence of 40 years will send a strong message to the defendant and others who might engage in this type of conduct about the potential consequences of this abhorrent behavior.

### F. The Applicable Sentencing Guidelines Range and the Need to Avoid Unwarranted Sentencing Disparities

A sentence of 40 years of incarceration is justified and appropriate here where the defendant's Sentencing Guidelines range is life. It is difficult to locate cases with defendants who

21

have the exact same number of identified victims involved. In the case of *United States v. Lucas Michael Chansler* (3:10-cr-00100-MMH-PDB) out of the Middle District of Florida, the defendant pled guilty to several counts of the production of child pornography. The defendant sextorted countless victims and ultimately 103 minor victims were positively identified. The defendant was sentenced to 105 years imprisonment. In the case of *United States v. James Patrick Burns* (3:21-cr-046-MMD-CSD) out of the District of Nevada, the defendant was charged with several counts of sexual exploitation of children (production of child pornography), among other charges. The underlying facts involved the defendant sextorting minor victims in very similar ways to the defendant. The defendant went to trial and was found guilty. The investigation revealed the defendant engaged in this conduct with hundreds of victims; however, a small number of those minors were charged. The defendant was sentenced to 65 years imprisonment. Considering a guideline range of life, and other similar case outcomes, a sentence of 40 years imprisonment is warranted.

### III.   The United States' Restitution Request

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime. *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

(A) Medical services relating to physical, psychiatric, or psychological care;
(B) Physical and occupational therapy or rehabilitation;
(C) Necessary transportation, temporary housing, and child care expenses;
(D) Lost income;
(E) Attorneys' fees, as well as other costs incurred; and
(F) Any other losses suffered by the victim as a proximate result of the offense.

22

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

In *Paroline v. United States*, 134 S. Ct. 1740 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id.* at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. Id. at 1726-27. Recognizing that under the circumstances of most child pornography possession cases – where losses resulted from harm caused by the trafficking of a victim's images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact," *Id.* at 1725, the Court held:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id.* at 1727. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id*. That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her

23

child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id*.

Third, the Court provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*.

Congress has since amended § 2259 to both codify *Paroline's* basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (December 7, 2018). As detailed in the Restitution Request materials, which will be filed under seal in a separate pleading, numerous victims depicted in the images and videos the defendant possessed and distributed are seeking restitution for costs associated with attending psychotherapy and/or counseling, medications, loss of income, loss of

housing, and for various medical expenses. To date, the following victims have requested restitution from the defendant:

1.  "Sloan" (Tara series), $10,000. The defendant possessed 2,311 image or video files from this series.  The restitution request materials are attached as Exhibit B1.

2.  "Lily" (Vicky series), $10,000.  The defendant possessed 8 image or video files from this series.  The restitution request materials are attached as Exhibit B2.

In addition, the United States is inquiring regarding restitution requests on behalf of additional known victims. As part of the plea agreement, the defendant has agreed that the Court may defer the imposition of restitution until after sentencing and has agreed to waive the 90-day provision found at 18 U.S.C. § 3664(d)(5) and consented to the entry of any orders pertaining to restitution after sentencing without limitation. ECF no. 19, Pgs. 9-10.

## IV.    Conclusion

The United States submits that a sentence of 40 years of incarceration is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  Such a sentence contemplates not only the relevant guidelines range set forth for these offenses, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*Karen Shinskie*

Karen Shinskie
Assistant United States Attorney

25